IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| CESAR QUINTANILLA #615509 | § | |
| v. | § | CIVIL ACTION NO. 9:08cv172 |
| OLIVER BELL, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff Cesar Quintanilla, proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. The lawsuit was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges. As Defendants in the lawsuit, Quintanilla named Oliver Bell, the chairman of the Texas Board of Criminal Justice; Rissie Owens, chairman of the Texas Board of Pardons and Paroles; Ben Raimer, vice president of the University of Texas Medical Branch; an unidentified member of the University of Texas Board of Regents; and various defendants at the Eastham Unit of TDCJ, including Warden Sweetin, Dr. Betty Williams, safety director Brenda German, maintenance supervisor Major Carter, Sgt. Stephen Partee, and practice manager Shanta Crawford.

An evidentiary hearing was conducted on January 8, 2009, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985). At this hearing, the parties consented to allow the undersigned United States Magistrate Judge to enter final judgment in the proceeding pursuant to 28 U.S.C. §636(c).

Quintanilla testified at the hearing that on October 11, 2007, he slipped and fell in the shower and was taken to the hospital. Quintanilla indicated that as a result of the injury, he was "in a coma for three days" and had to be flown to the hospital in Tyler by helicopter. He thought that he had undergone surgery in Tyler and said that "a liquid" was injected intro his head. As a result of the

1

injury, Quintanilla stated that he suffered from brain damage, memory loss, headaches, and dizziness.

However, he complained that when he was returned to his prison unit, he did not receive proper or appropriate care. He says that he has been taken to the University of Texas Medical Branch hospital in Galveston and that he receives proper care there, but upon his return to his unit, the medical staff "takes away his treatment." He says that Dr. Williams discontinued medication which he received in Galveston and gave him psychiatric medication instead, and this medication caused him to suffer a reaction. He told the doctor about this, but four months later, she prescribed the same medication again. He says that he has only seen Dr. Williams twice in two years, despite writing numerous grievances and I-60 inmate request forms.

Quintanilla also said that he would get prescriptions from the medical staff but these would not be entered into the computer, so when he went to the pill window to pick them up, there was no record of them. He would then have to go back to the medical department.

Quintanilla testified that he sued Oliver Bell because Bell is chairman of the Board of Corrections and therefore in charge of the prison. He sued Rissie Owens, chairman of the Board of Pardons and Paroles, because he was supposed to have been paroled six months before the accident and that if he had been paroled, thus would not have happened. He also said that "there were too many inmates" and the showers were always crowded, indicating that this crowding could be eased by paroling more inmates. Similarly, Quintanilla said that he sued Ben Raimer and the member of the University of Texas Board of Regents because of their positions of authority and responsibility.

Quintanilla complained that Warden Sweetin has not responded to his grievances or I-60 inmate request forms, and has not given him a chance to talk to him. He stated that Brenda German, the safety director at the Eastham Unit, is in charge of making sure that the shower is safe. He indicated that she admitted in a grievance that the shower floor was slippery, but did not do anything about it. Likewise, he said, Major Carter and Sgt. Partee did not do their jobs properly by making sure that the shower was safe.

Finally, Quintanilla said, Shanta Crawford, the Eastham Unit practice manager, should make sure that inmates get the medical care that they need. He says that he sent her I-60 inmate request forms and she responded only once, even though she is responsible for the provision of health care at the Eastham Unit.

Quintanilla said that Dr. Williams was the "main person" he is suing, stating that she did not give him the right medications or the right dosages which were ordered by the hospitals in Tyler and Galveston. She says that she changed his medications and also gave him medications having nothing to do with his problems, and which interfered with his high blood pressure medication. He also complained that Dr. Williams has ignored his requests to see her and that he has actually seen her only twice in the last two years.

Quintanilla stated that while he sees medical personnel, they always tell him that he has medications, but he only has high blood pressure medication; he says that he has been taking Naproxen, a pain reliever, for years.

Nurse Kathy Grey, a correctional nurse also present at the <u>Spears</u> hearing, testified under oath concerning the contents of Quintanilla's medical records. She stated that Quintanilla suffered a fall in the shower and was in an "altered state of consciousness," and so was taken to Trinity hospital and then life-flighted to the hospital in Tyler. She said that the medication which he was given and which was later changed was Robaxin, a muscle relaxant, which she said should not be given over a long period of time. She acknowledged that Quintanilla had high blood pressure and that his prescription for Naproxen was discontinued; this was replaced with meloxicam, which like Naproxen is a non-steriodal anti-inflammatory pain reliever, but Quintanilla had a reaction to the meloxicam and it was discontinued.

At the time of the injury, Nurse Grey said, Quintanilla was determined to have a closed-head injury. A CT scan was done in Tyler, and he was diagnosed with a concussion. He was treated with medication and ordered bed rest for two weeks, with activity as tolerated. At the unit, he was medically unassigned for 90 days.

Nurse Grey also stated that Quintanilla has put in a number of sick call requests complaining of headaches, numbness, pain in his shoulder, memory loss, and dizziness. No fractures or intracranial injuries were found, although he did have degenerative disc disease in his neck. She explained that a concussion was an injury to the brain, not necessarily bruising.

### The TDCJ Records

The Court has received and examined a copy of Quintanilla's prison records, including his medical records. In reviewing these records, the Court will assume that Quintanilla's testimony is true, and will disregard any factual assertions made at the Spears hearing or contained in the prison records which contradict factual assertions made by Quintanilla. *See generally* Wilson v. Barrientos, 926 F.2d 480, 482-83 (5th Cir. 1991).

The prison medical records contain a Correctional Managed Care Emergency Record showing that on October 11, 2007, Quintanilla slipped and fell in the shower. When he arrived at the unit clinic, he was able to speak and answer questions at first, but after about 15 minutes he demonstrated a decreased level of consciousness and incontinence of urine. The diagnosis was listed as "closed head injury, severe" and the provider ordered him transferred to the nearest medical facility. His condition on discharge was listed as "unstable."

From there, he was sent to the East Texas Medical Center trauma clinic in Tyler. A CT scan was done and he was determined to have a concussion. He was discharged from the hospital on October 13 and returned to the Eastham Unit, and went to the clinic the next day complaining of pain in his head and that he was afraid to go to sleep. He stated that when he laid down to close his eyes, he got a panicky feeling like he was going to "die again." The nurse gave him information on head injuries as well as issuing passes per orders from the hospital and a referral to the mental health department.

On October 16, Quintanilla had a followup visit for a blood pressure check, at which he complained of memory loss and lapses in time but said that he was doing "some better." The nurse noted that he would continue to be monitored.

Quintanilla saw the mental health department on October 17, but told them that he did not know why he had been referred there. He denied any mental health treatment history or any need for such treatment, and he was told to submit an I-60 to the mental health department in the future if he experienced mood difficulties or psychotic symptoms.

On October 23, 2007, Quintanilla was seen in the hospital in Galveston. He was given an injection for neck pain and prescribed a Medrol pack (for inflammation and swelling) and Robaxin, a muscle relaxant. On October 31, the prescription for Robaxin was deferred by the TDCJ regional pharmacy because of rapid tolerance and because Robaxin is not used as a long-term medication in TDCJ; although the Robaxin was discontinued, the physician's assistant, Matthew Hand, directed that Quintanilla continue to take Naproxen and prednisone, an anti-inflammatory, as ordered.

On November 15, 2007, Quintanilla was seen at nursing sick call, complaining of neck pain and numbness in his left hand. He was told to continue the protocol which the physician's assistant had prescribed for him and that if this does not work, to return in two weeks for re-evaluation. On November 20, he saw another physician's assistant, Julia Lawson, complaining of "a bubble right here on my head" and saying that when he turns his head from the left, he gets dizzy. He was told to continue his current medications and to keep his upcoming medical appointments; he was also medically unassigned for six weeks.

On January 8, 2008, Quintanilla saw a third physician's assistant, Lloyd Aschberger, complaining of headaches with occasional dizziness. Aschberger noted no distress, found Quintanilla's neck to be supple, no nystagmus (wobbling or shaking of the eyes), and no facial asymmetry, and believed that Quintanilla may be suffering from muscular tension; he prescribed Robaxin. On January 24, Quintanilla's prescription for Naproxen was renewed. On that date, the medical records show that Quintanilla had prescriptions for psyllium powder (a fiber laxative also used to lower cholesterol), hydrochlorothiazide (a diuretic used to remove excess fluid and thereby treat high blood pressure), ranitidine (a stomach acid reducer), metroprolol (a high blood pressure medication), pravastatin (a cholesterol reducer), and naproxen, an anti-inflammatory pain reliever.

On January 31, an antibiotic called sulfamethoxazol and an anti-nausea medication called meclizine were added.

## Legal Standards and Analysis

Quintanilla's primary complaint concerns his allegations of deliberate indifference to his serious medical needs. The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997); Jackson v. Cain, 864 F.2d 1235, 1246 (5th Cir. 1989). However, simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985); Norton, 122 F.3d at 293.

Furthermore, malpractice alone is not grounds for a constitutional claim. Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991). Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action. Graves v. Hampton, 1 F.3d 315, 319-20 (5th Cir. 1993). The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs. Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs. Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985). It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995).

In Domino v. TDCJ-ID, 239 F.3d 752 (5th Cir. 2001), a inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute

examination; the inmate committed suicide two and a half hours later. The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Id. Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." Estelle v. Gamble, 429 U.S. 97, 107 (1972). And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 838 (1994).

Domino, 239 F.3d at 756; *see also* Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999).

In this case, Quintanilla's testimony, as well as the medical records which do not contradict his testimony, plainly show that Quintanilla has received a substantial quantum of medical care, including transport to the hospital, numerous visits with nurses and medical providers, and prescriptions for various medications. His own testimony and the medical records refute any contention that the prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct showing a wanton disregard for any serious medical need. *See* Banuelos, 41 F.3d at 235. While there is no question that Quintanilla did in fact have a serious medical need, this need was promptly responded to through transport to a local hospital and then by helicopter to a trauma center in Tyler. He then had numerous followup visits with medical personnel, including a trip to University of Texas Medical Branch hospital in Galveston. Quintanilla's claim of deliberate indifference to his serious medical needs is without merit.

Quintanilla also complained that the conditions in the shower were slippery and that this caused his fall. As a general rule, slip and fall claims come under the rubric of negligence. In McLaughlin v. Farries, 122 Fed.Appx. 692 (5th Cir., Sept. 13, 2004) (not selected for publication in the Federal Reporter), an inmate complained that a leaky air conditioner caused water to accumulate on the floor of his cell, and that the defendants knew about this and negligently failed

to take action. The inmate slipped and fell in the water, injuring himself. The Fifth Circuit held that the inmate's claim was one of negligence, which was not actionable under Section 1983. *See also* Marsh v. Jones, 53 F.3d 707, 711-12 (5th Cir. 1995) (no remedy under Section 1983 for prisoner's injury sustained in a slip and fall); Benton v. Grant, 31 Fed.Appx. 160 (5th Cir., December 27, 2001) (not selected for publication in the Federal Reporter) (no remedy under Section 1983 for injuries sustained in jail slip and fall or for claim that defendants knew of leak in ceiling and failed to repair it).

The Supreme Court has stated that the Due Process Clause of the Fourteenth Amendment is not implicated by a negligent act of an official causing unintended injury to life, liberty, or property. Daniels v. Williams, 474 U.S. 327, 331-33 (1986). Complaints by prisoners for negligence on the part of prison officials, even where serious injury occurs, do not set out a valid claim under the Civil Rights Act even if such complaints could be valid under state law. *See* Bowie v. Procunier, 808 F.2d 1142 (5th Cir. 1987).

In this case, Quintanilla offers nothing to suggest that the slippery conditions in the shower were the result of deliberate indifference by any of the named Defendants, as opposed to simple negligence. The Supreme Court has held that

> [A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. ...
>
> But an official's failure to alleviate a significant risk which he should have perceived, but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 1979 (1994); *see* Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994). Quintanilla has not shown that any of the named Defendants knew of and disregarded an excessive risk to inmate health or safety, or that any of the named Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm

8

exists, and that they drew that inference. His claims regarding the allegedly unsafe conditions in the shower fail to rise to a level of constitutional dimensions and thus are without merit.

Nor has Quintanilla set out a valid claim against any of the Defendants whom he named in his lawsuit. He testified that he sued Bell, Owens, Raimer, the unidentified member of the University of Texas Board of Regents, and Sweetin because their positions of authority. Lawsuits against supervisory personnel based on their positions of authority are claims of liability under the doctrine of *respondeat superior*, which does not generally apply in Section 1983 cases. Williams v. Luna, 909 F.2d 121 (5th Cir. 1990). A supervisor may be held liable if there is personal involvement in a constitutional deprivation, a causal connection between the supervisor's wrongful conduct and a constitutional deprivation, or if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind a constitutional deprivation. Thompkins v. Belt, 828 F.2d 298 (5th Cir. 1987).

In this case, Quintanilla has not shown that Bell, Owens, Raimer, the unidentified member of the Board of Regents, or Warden Sweetin were personally involved in a constitutional deprivation, that wrongful conduct by any of these individuals was linked to a constitutional deprivation, or that they implemented constitutionally deficient policies which were the moving force behind a constitutional deprivation. To the extent that he seeks to hold these individuals liable under a theory of supervisory liability, his claims against them are without merit.

Quintanilla contends that Rissie Owens, the Chairman of the Texas Board of Pardons and Paroles, should be liable because, as he explained at the hearing, he was supposed to have been paroled six months before the incident occurred, and had he been paroled, he would not have fallen in the shower; he also said that not enough inmates are being paroled, with the result that the showers are too crowded. These claims plainly fail to set out any basis for liability on the part of Owens. Quintanilla has no constitutional right to release on parole when he became eligible, *see* Allison v. Kyle, 66 F.3d 71, 74 (5th Cir. 1995), and the injuries which he suffered from falling in the shower could not reasonably be foreseen as a result of a failure to parole enough inmates. *See generally*

9

Hadley v. Baxendale, 9 Ex. 341, 1565 Eng. Rep. 145 (1854); *compare* Martinez v. California, 444 U.S. 277, 284-85 (1980) (state officials cannot be held liable for the death of a private citizen at the hands of a parolee because the causal connection between the decision to release the parolee from prison and the murder was too attenuated to establish a deprivation of constitutional rights under Section 1983).  Although Quintanilla complains of crowded conditions in the shower, the records indicate and he does not dispute that he was alone in the shower when he fell.  His claim against Rissie Owens is without merit.

Quintanilla also complained that Warden Sweetin would not answer his grievances.  The Fifth Circuit has held that inmates do not have a constitutionally protected liberty interest in having grievances resolved to their satisfaction, and so there is no violation of due process when prison officials fail to do so.  Geiger v. Jowers, 404 F.3d 371, 373-74 (5th Cir. 2005); *see also* Edmond v. Martin, et al., slip op. no. 95-60666 (5th Cir., Oct. 2, 1996) (unpublished) (prisoner's claim that a defendant "failed to investigate and denied his grievance" raises no constitutional issue); Thomas v. Lensing, et al., slip op. no. 01-30658 (5th Cir., Dec. 11, 2001) (unpublished) (same).  His claim against Warden Sweetin is without merit.

Nor has Quintanilla shown any valid basis for liability against the remaining Defendants, Dr. Williams, Brenda German, Major Carter, Sgt. Partee, or Shanta Crawford, because he has not shown that any of these individuals were deliberately indifferent to his safety or to his serious medical needs.  Quintanilla's claims are without merit and his lawsuit should be dismissed.

## Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees.  Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. <u>Neitzke v. Williams</u>, 490 U.S. 319, 325-7 (1989). A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. <u>Neitzke v. Williams</u>, 490 U.S. 319, 327, (1989), *citing* <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984); *see also* <u>Blackburn v. City of Marshall</u>, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Quintanilla's complaint lacks any arguable basis in law and fails to state a claim upon which relief may be granted. Consequently, his lawsuit may be dismissed as frivolous under 28 U.S.C. §1915A(b). *See generally* <u>Thompson v. Patteson</u>, 985 F.2d 202 (5th Cir. 1993). It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous. 28 U.S.C. §1915A. It is further

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

So **ORDERED** and **SIGNED** this **23** day of **January, 2009.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE